UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CARLENE WILLIAMS,                 :
                                  :
        Plaintiff,                :
                                  :
v.                                :     No. 3:03CV2200(DJS)
                                  :
QUEBECOR WORLD INFINITI           :
GRAPHICS, ET AL.,                 :
                                  :
        Defendants.               :

<u>MEMORANDUM OF DECISION</u>

On December 19, 2003, plaintiff Carlene Williams ("Williams") filed this action alleging that her employer, Quebecor World Infiniti Graphics, Inc. ("Infiniti"), a subsidiary of Quebecor World (USA) Inc. ("Quebecor World"), discriminated against her because of her age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 <u>et</u> <u>seq</u>., and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a) <u>et</u> <u>seq</u>. On January 10, 2005, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, defendants filed a motion for summary judgment. **(Dkt. # 41.)** For the reasons set forth herein, defendants' motion (dkt. # 41) is **DENIED**.

## I. FACTS

Carlene Williams was born on December 16, 1942.  In September 1988, she began working as a customer service

supervisor for defendant Infiniti's corporate predecessor, K
& R Printers, Inc. ("K & R").[1]  This position required
plaintiff to work with K & R's sales representatives and
assist with handling orders and other customer relations
issues.  When K & R became Infiniti Graphics, Inc.,
plaintiff moved from the customer service department to the
sales department.

The parties dispute what post Williams assumed when she
was transferred to the sales department.  Plaintiff asserts
that for a brief period, she continued working as a customer
service representative as well as a sales representative.
She further claims that she ultimately assumed the position
of sales representative when she replaced retiring sales
representative Leo Venzino.  Defendants disagree; they
maintain that Williams became an "envelope specialist" when
she joined the sales department.[2]

Williams claims that she performed all of the duties of
a "sales representative" as listed in Quebecor World's Sales

---

[1]  In 1999, World Color, Inc., acquired Infiniti Graphics, Inc.  World
Color, Inc., later merged with defendant Quebecor, at which time Infiniti
became a subsidiary of Quebecor.

[2]  Williams concedes that she had business cards with the title
"envelope specialist" printed on them "in order to market [her] expertise
to envelope companies." (Dkt. # 50, Williams Aff., Ex. 2 at ¶ 8.)  However,
she also asserts that she had another set of business cards that she used
when prospecting for non-envelope business. Plaintiff does not identify
what title appeared on her other set of business cards.

Representative Position Description.  These responsibilities include:

- making in-person and telephone calls on existing and prospective accounts;

- preparing and delivering sales presentations;

- learning the graphic arts needs of prospective accounts;

- counseling buyers on the effectiveness and economy of proposed and existing print projects;

- providing accurate and complete job specifications to the Estimating Department;

- checking artwork for accuracy, reproducibility, and conformance to bid quotation specifications;

- reviewing proofs with customers;

- keeping customers informed of defendants' manufacturing capabilities, as well as any special charges, schedule adjustments, and other changes;

- keeping management informed of significant marketplace developments;

- filing timely and complete sales call, expense and other reports;

- ensuring that defendants receive any credit applications prior to customer receipt of work;

- calling regularly upon all assigned accounts based on a schedule developed with the Sales Manager;

- attending sales meetings;

- arranging for and attending buyer plant tour and press approvals;

- keeping abreast of technical development and educating customers as to such developments as appropriate;

- assisting in the collection of overdue accounts upon request;

- ensuring defendants were aware of any customer concerns; and

- meeting sales and profit goals while operating within expense budget.

(Dkt. # 51, Ex. 3.) In addition, Williams asserts that she was responsible for bringing in new business, ensuring that existing customers were satisfied, and "growing" existing accounts. She claims that she succeeded in bringing in a number of new envelope and non-envelope clients.[3]

Defendants claim that Williams was not responsible for prospecting for new customers and that her position was unique to the sales department. Indeed, they assert that the "envelope specialist" position was created specifically to service Infiniti's existing commercial envelope customers. (Dkt. # 48, Amarante Aff., Ex. D at ¶ 5.) The record, however, does not contain a job description for the position of "envelope specialist."

Plaintiff offers documents entitled, "Infiniti Graphics, Inc.'s Comparative Sales Report for Carlene

---

[3] Plaintiff alleges that she brought in the following envelope companies: Tension Envelope, Worcester Envelope, Berlin & Jones, and National Envelope. She also asserts that she brought in the following non-envelope companies: Standish Graphics, Natural Health Care, and Hachett. Defendants allege that Standish and Hachett were existing accounts that were transferred to plaintiff.

Williams," which list her position as "Salesperson." (Dkt. #
51-8, Ex. 6.)  Defendants do not dispute that plaintiff
attended sales meetings. (Dkt. # 51, Toombs Dep., Ex. 5 at
135:6-7.)  Indeed, Ron Amarante ("Amarante"), Infiniti's
General Manager,[4] acknowledged that plaintiff's position
"was a member of the sales group." (Id.)  He classified her
position as a "a sales position that serviced the envelope
clients," (Dkt. # 48, Amarante Aff., Ex. B at 93:17-21) and
defined "servicing accounts" as "maintaining or increasing
the volume of work from existing accounts." (Id. at 95:22-
24.)  He further described the envelope specialist position
as the only member of the Sales Department that focused on
one specific segment of clients. (Id. at 99:4-6.)

Plaintiff's direct supervisor, Sales Manager John
Toombs ("Toombs"), also provided deposition testimony
regarding plaintiff's duties.  He testified that plaintiff
did not work on price estimates for client orders and that,
unlike the other sales representatives, she did not have to
take specs on most jobs. (Dkt. # 51, Toombs Dep., Ex. 5 at
130:9-24.) He later testified, however, that plaintiff was
involved in communicating pricing to her clients, but had
very little, if any, control over the pricing itself. (Dkt.
# 50, Toombs Dep., Ex. 5 at 132:6-17.)  In addition, he

---

[4] Amarante's title is also referred to as "Plant Manager" in Plaintiff's
Memorandum in Opposition to Defendants' Motion for Summary Judgment (dkt. #
50) and other documents.

noted that he did not recall seeing a copy of plaintiff's job description for the position of "envelope specialist."

Plaintiff states that in 2000, Plant Manager Clint Humphrey told her that she should not prospect for new business at that time but should instead concentrate on servicing her existing clients. She also asserts that in February 2001, the company told her to sell a particular press process to envelope companies, and that the company later told her to prospect for potential non-envelope customers.  Amarante states that although plaintiff was not initially expected to bring in new clients, the job requirements for the "envelope specialist" position expanded in 2001.  According to Amarante, beginning in 2001, plaintiff was expected to prospect for new business as part of her responsibilities, just as the other sales representatives were expected to do. (Dkt. # 51, Amarante Dep., Ex. 8 at 98:4-7; dkt. # 51, Amarante Dep., Ex. 8 at 99:15-18.)

Toombs, however, asserts that plaintiff was not expected to actively solicit new business for the company and that he never set specific sales goals for her like he did for other members of the Sales Department. He states that he never set sales goals for her "because [he] knew she couldn't do it." (Dkt. # 51, Toombs Dep., Ex. 5 at 139:22-24.) During his deposition, however, Toombs conceded that he

told plaintiff, as he told all of the sales representatives, that "there's always a need to bring in new business." (Id. at 105:2-12.) Within the same deposition, Toombs asserted that plaintiff "was given the opportunity to [prospect for new business]," (Id. at 110:16.), although he later testified that plaintiff "was not truly expected to bring in significant new business . . . . " (Id. at 138:14-15.)

Plaintiff claims that she prospected for new business, as Toombs had requested, and submitted names of prospective customers to Toombs for his approval.  According to plaintiff, Toombs did not discuss her list of perspective customers or give her permission to pursue these leads. Toombs acknowledges that Williams gave him a list of names between July 2000 and November 2001; however, he asserts that he does not know what happened to the list. (Id. at 108:22-25.) Plaintiff further asserts that Toombs criticized her for not bringing in new business.

Defendants argue that Williams's envelope specialist position was eliminated because the elimination of any other position in sales department would have had the potential for reducing the bottom line.  In support of this contention, defendants argue that Williams was not actively soliciting or bringing in new business and that she primarily served two customers (Mead Westvaco and Worcester Envelope), both of which could be serviced by senior

management with the assistance of a customer service representative.  Williams disputes these assertions and maintains that Toombs hindered her efforts to bring in new business.  She also asserts that she successfully grew existing customer accounts.

Williams first assumed control of the Mead Westvaco ("Westvaco") and Worcester Envelope[5] ("Worcester") accounts when she was transferred to the Sales Department in 1991. At that time, Westvaco was Infiniti's largest envelope customer. Thereafter, pursuant to a 1996 arrangement between Infiniti and Westvaco, Infiniti purchased a unique press, which was used exclusively for Westvaco orders.  Defendants assert that this was the only such press available in the region. (Dkt. # 48, Amarante Aff., Ex. E at ¶ 8.) Plaintiff argues that in 2001, she was instructed to sell printing on this press to other envelope customers even though her employer previously prohibited her from selling this type of printing to other customers.

Defendants state that plaintiff's sales to Westvaco increased by over $800,000 the year after Infiniti obtained the press, an increase they attribute to the installation of the new press rather than to plaintiff's sales ability. Plaintiff disputes this assertion.  She argues that her

_____

[5]  The account was known as "New England Envelope" at that time but was later bought out by Worcester.

sales to Westvaco increased from $846,279.00 to $1,576,272.00 (approximately $730.293.00) between 1994 and 1995 and that it is not clear that this increase was related to the press.  (Dkt. # 51, Ex. 6.) She also argues that her 1996 sales to Westvaco were $1,475,743.00.  (Id.)

Defendants assert that for most of the time Williams worked in the Sales Department, and particularly during her last five years at Infiniti, her Westvaco and Worcester accounts made up more than 95% of the sales for all of her accounts.  Plaintiff denies that Worcester and Westvaco made up this percentage of her sales volume.  Defendants further assert that in 1999 and 2000, plaintiff worked with only three customers other than Worcester and Westvaco, and that two of these accounts, American Saw and Smith & Wesson, were accounts assigned to plaintiff.  Defendants state that the combined sales of the three accounts other than Worcester and Westvaco made up less than 3% of her total sales.  Plaintiff disputes both of these claims.[6] In addition, defendants state that in the year 2001, up until her termination in November, plaintiff was responsible for only one customer other than Worcester and Westvaco, and that

---

[6] Plaintiff asserts that during 1999 and 2000 her customers included: American Saw & Manufacturing; Smith and Wesson; Tension Envelope; four separate Westvaco accounts; and Worcester Envelope.

customer represented less than one percent of her total sales.

Williams argues that at the time of her termination: (1) her sales made up between 20-30% of the total sales dollars for the defendants; (2) she consistently represented three of the top ten sales accounts; and (3) she had the highest sales volume of any sales representative for two years running. (See dkt. # 51, Ex. 6; dkt. # 51, Ex. 14; dkt. # 51, Ex. 7.)  In response, defendants contend that plaintiff did not have a significant impact on the volume of sales that came from her two largest accounts, Westvaco and Worcester, even though Toombs admits he did not have any conversations with anyone at Worcester or Westvaco which led him to this conclusion. (Dkt. # 51, Toombs Dep., Ex. 5 at 137:23-25, 138:1-7.)  Defendants attribute the amount of sales from plaintiff's Westvaco accounts to Infiniti's printing press and the price Infiniti offered, "both of which were unaffected by the relationship plaintiff had or did not have with the people at Worcester." (Dkt. # 43 at 3.)

During her tenure at Infiniti, plaintiff alleges that two managers, Amarante and Toombs, made several discriminatory comments to her. Toombs was the Sales Manager at Infiniti and had been plaintiff's immediate supervisor

since approximately July 2000.  Amarante, as the General
Manager, supervised all plant employees and was responsible
for all aspects of the plant, including safety, quality,
productivity, and profitability.  At the time of plaintiff's
dismissal, Amarante was 40 years old and Toombs was 41 years
old.

Plaintiff accuses Amarante and Toombs of making a total
of five allegedly age-biased remarks.  According to
plaintiff, Amarante made two ageist remarks and Toombs made
three age-biased comments.  Williams claims that while she
was in Amarante's office, he asked her, "What's up with the
gray hair?" (Dkt. # 51, Williams Dep., Ex. 1 at 323:24.)
Plaintiff did not respond, and Amarante continued, "Oh, I
know, I'm such a bastard." (Id. at 324:16.)  She responded,
"I can't disagree with the general manager." (Id. at 324:17-
18.)  Williams admits that she colored her hair a shade of
auburn for the majority of time that she worked at Infiniti,
and that during the summer of 2001 she stopped coloring her
hair for a period of approximately three months. (Dkt. # 51,
Williams Dep., Ex. 1 at 322:21-25.)  Amarante denies making
these comments; he asserts that plaintiff once commented to
him about the color of her hair while she was in his office.
(Dkt. # 48, Amarante Aff., Ex. D at ¶ 15.)  Alternatively,
defendants argue that even if Amarante did comment on

plaintiff's gray hair color, he did so because he was surprised that it had turned gray so quickly.

Plaintiff alleges that in September or October 2001, Amarante approached her in the hallway and "made some comment first and then he said, 'Hey, when are you retiring? I want your job.'" (Dkt. # 51, Williams Dep., Ex. 1 at 335:8-9.) Plaintiff answered, "Yeah, I know. I drive in the car eating Bon Bons all day." (Id. at 335:10-11.) Amarante admits that he made this comment to plaintiff, but contends that it was meant as a reflection on how easy her job was and was not meant to suggest whether or when she might be leaving.

Plaintiff asserts that there were three separate instances in which Toombs, her immediate supervisor, subjected her to ageist comments. The first was during the fall of 2001, when plaintiff claims that Toombs asked her either, "Carlene, when are you going to retire?" or "When are you retiring?" which took plaintiff by surprise.[7] (Id. at 362:16-17; Id. at 367:9-11.) In response, plaintiff recalls that she informed Toombs that "she wouldn't even be thinking about retiring until [she] was at least 62 [years

_____

[9] Plaintiff does not remember the exact words of the conversation but is certain that Toombs used the word "retirement" and did not simply question her about her plans for the future. (Id. at 367:14-17).

old].'' (Id. at 364:25-365:1.) Toombs acknowledges that this conversation took place.[8]  He states that he asked plaintiff about her future plans in order to plan for the company's future; however he is not certain whether he used the word "retirement."  Toombs explains that he was motivated in part to inquire about Williams's future plans because Infiniti Graphics, had been an employee-owned stock corporation, and plaintiff received approximately $400,000 under the employee stock ownership plan ("ESOP") when World Color acquired Infiniti Graphics.[9]  Plaintiff acknowledged that at that time "lots of people [were] talking about the fact that they were going to retire" as a result of the money that they had received (dkt. # 48, Williams Dep., Ex. C at 341:11-16), but she asserts she never discussed the amount of money she received with any Infiniti employee.  Toombs was aware that plaintiff had received a "substantial amount" of money from the sale and stated that he felt that this "distribution of funds from a prior sale of the organization . . . would allow some people to consider [the opportunity to retire]" (dkt. # 48, Toombs Aff., Ex. E at ¶ 24; dkt. # 51, Toombs Dep., Ex. 5 at 152:8-14), which is why he asked plaintiff

---

[8] Toombs asserts that the conversation happened in the summer of 2000, and not in the summer of 2001 as plaintiff claims.

[9] Toombs himself also received an unidentified sum of money from the ESOP distribution.

about her future plans.  In addition, Toombs explains that
due to a change in the reporting structure, plaintiff
started reporting to him.  As a manager, he thought that "it
was reasonable information to find out what her long-term
plans were," (Id. at 152:18-20) because he was seeking to
"mak[e] plans for future business" (Id. at 152:23).  Toombs,
however, does not recall asking other sales representatives
about their retirement plans at that time.

During the same period of September or October 2001,
plaintiff asserts that Toombs again questioned her on when
she was going to retire. Plaintiff reiterated to Toombs that
she intended to continue working "for at least three more
years.  I can't retire yet until I learn to say no to my
children." (Dkt. # 51, Williams Dep., Ex. 1 at 365:13-15.)
Williams alleges that Toombs said that, "he did not see how
she could successfully prospect for new business if she was
planning to retire in three years." (Id. at 366:4-8.)
Plaintiff told Toombs that she felt it did not take three
years to turn prospects into customers. Toombs does not
recall mentioning retirement to plaintiff a second time.

Plaintiff also attributes a third comment to Toombs,
which she felt was a reflection of an ageist attitude. (Id.
at 386:6-8.) In late October 2001, plaintiff had been
present at one of Westvaco's plants when five Westvaco

employees were informed that they were being laid off. Plaintiff had worked with these employees, four of whom were her age or older.  Plaintiff states that these employees had been with Westvaco for many years, that she called Toombs to tell him about the layoffs, and that she was "just terribly upset." (Id. at 387:9.) Plaintiff does not recall her exact words but "said something about the fact that the four of them were all older.  I said, 'I can't believe that they have just let them go after all these years and after all their service.'" (Id. at 387:13-17.)  She asserts that Toombs responded by saying, "Well, that's the way business is today."[10] (Id. at 387:18-19.) Williams interpreted Toombs's remark to mean "that business today likes to dump people when they get old." (Id. at 406:2-3.)  Toombs does not recall making that specific statement but "do[es] recall saying something similar to that." (Dkt. # 51, Toombs Dep., Ex. 5 at 156:16-17.)

In addition to accusing Toombs of making age-biased remarks during the fall of 2001, Williams accuses Toombs of regularly scheduling sales meetings with her only to later cancel them.  She further asserts that Toombs and his

---

[10] The comment attributed to Toombs is alternatively listed as "Well, that's business today," in Toombs's deposition, Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, and in Plaintiff's 56(a)(2) Statement of Material Facts in Dispute. (Dkt. # 50, Toombs Dep., Ex. 5 at 156:2-3; Dkt. # 50, at 11; Dkt. # 51 at ¶ 41.)

supervisor, William Sherman ("Sherman") set up meetings with the other sales representatives to discuss sales and business issues, but they told her that they did not have time to meet with her.

On November 9, 2001, plaintiff was called into a meeting with Amarante, Toombs, and Jo Anne Mattern, the Director of Human Resources. During this meeting, Amarante informed plaintiff that her position was being eliminated. Upon being notified of this, plaintiff responded, "Well, this is the thanks I get for working my butt off for all these years." (Dkt. # 48, Williams Dep., Ex. C at 414:17-20.) Plaintiff states that Amarante replied, "Doesn't matter, your position is eliminated."[11] (Id. at 414:21-22.) Williams, who was 58 years old at the time of her termination, was not offered another position with the company. She was, however, offered a termination package, which she declined.

The parties dispute whether plaintiff was the second oldest employee at the time of her termination. After Williams was terminated, her job responsibilities were distributed between Amarante, age 40; Toombs, age 41; and a customer service representative, Brian O'Keefe ("O'Keefe"),

---

[11] In her deposition, plaintiff initially attributed this comment to Toombs, but when counsel asked her to clarify, she testified that she believed that Amarante had made the comment. (Dkt. # 48, Williams Dep., Ex. C at 414:23-35.)

age 31.  O'Keefe received an additional non-commission supplement in the amount of $1,000 per month for taking on these responsibilities. (Dkt. # 51, Amarante Dep., Ex. 8 at 69:8-24.)  The other sales representatives who were retained by the company were 46, 41, 40, and 33 years of age. Plaintiff further asserts that Darryl Cook, a 33 year-old sales trainee at the time, had less than two years sales experience.

Plaintiff alleges that around the same time she was terminated, defendants also eliminated the position of Charles Burdick ("Burdick"), whose date of birth is December 16, 1936.  Defendants assert that Burdick's position was eliminated because the press he operated was no longer going to be used, and that Burdick decided to retire.  Yet, defendants admit that the press Burdick operated remained in operation until at least 2004, and that Burdick's younger assistant continued to work on the press after Burdick left the company.

Prior to plaintiff's termination, Infiniti had eliminated two sales positions; one during the winter of 2000 and the other during the summer of 2001.  Then, during the third quarter of 2001, Toombs's supervisor, the Vice President of Sales for Quebecor World (USA) Inc., told Toombs that another sales position might need to be eliminated depending on the third quarter numbers.  Once the

third quarter numbers were known, Sherman told Toombs and Amarante that an additional sales position had to be eliminated.[12]   Toombs and Amarante determined that Williams's position was the one could be most beneficially eliminated with the least negative impact on revenue, and Sherman states that he was in agreement with that decision. (Dkt. # 48, Sherman Aff., Ex. F at ¶ 9.)

Amarante felt that both of plaintiff's clients would continue to do business with Infiniti after she left and that it was unlikely that her continued employment would result in any additional business for the company.  Toombs avers that he considered the following factors when determining which position to eliminate: (1) the customer base; (2) the prospects; (3) the potential for work; and (4) whether the customers would remain with the Infiniti.[13] He reviewed each position in the sales department and selected Williams's position; however, he does not recall how the other employees fared compared to the plaintiff or what conclusions he drew in regards to the evaluation for the other sales representatives.

---

[12]   Amarante stated that Infiniti's parent corporation, Quebecor World (USA), Inc., required Infiniti to reduce its costs and overhead.

[13]   Amarante alternatively listed the criteria as (1) cost savings; (2) potential for work to stay with Infiniti; and (3) potential of new business.

Toombs asserts that the company had determined that plaintiff would have trouble prospecting for new clients despite the levels of sales she brought in from Worcester and Westvaco because "those were accounts that were long-standing with Infiniti Graphics.  In [his] view, she had little to no impact on them becoming customers or the volume [of sales] that they generated." (Dkt. # 48, Toombs Dep., Ex. A at 113:17-20.)  Furthermore, Toombs "didn't believe Carlene [Williams] had any influence on the volume of work that came in from either of her two accounts." (Id. at 137:1-3.)  Toombs, however, admits that he did not know how Worcester or Westvaco became customers of Infiniti and whether the other sales representatives had single customers with comparable levels of sales.  Toombs further stated that he considered sale levels when evaluating all of the sales representative positions. (Dkt. # 51, Toombs Dep., Ex. 5 at 112:7-17.)

Sometime after plaintiff was terminated, Infiniti hired Tom Cribbin ("Cribbin") as a sales representative. Toombs, who was involved in the decision to hire Cribbin, testified that Cribbin was hired because another sales representative left Infiniti.  Toombs states that Cribbin was hired because of the opportunity to bring in a significant amount of new business and that the reasons for which plaintiff was

terminated had not changed.   (Dkt. # 51, Toombs Dep., Ex. 5 at 145:8-146:6.)

Defendants allege that complaints were made in regard to plaintiff's job performance by her client Westvaco. (Dkt. # 51, Amarante Dep., Ex. 8 at 72:14-22.) Amarante, however, does not know if Williams was ever disciplined for her interactions with customers, and he stated that plaintiff's attitude was not considered when Amarante, Toombs, and Sherman discussed job eliminations and chose to eliminate Williams's position. (Dkt. # 51, Amarante Dep., Ex. 8 at 83:11-25.)  Plaintiff argues that in the thirteen years she worked at the company, she was never disciplined.  Plaintiff offers affidavits from two Westvaco employees who had business dealings with her: Westvaco Purchasing Agent Douglas Young ("Young") and Westvaco Purchasing Agent Richard Volker ("Volker").  Volker had worked with plaintiff for ten years until his retirement in 2000.  Young worked with plaintiff from April 2000 until April 2001.  They both characterized Williams as knowledgeable and responsive to Westvaco's needs.  (Dkt. # 51, Ex. 15-16.)

On or about January 25, 2002, plaintiff filed administrative charges of discrimination on the basis of her age with the Connecticut Commission of Human Rights and Opportunities ("CCHRO") and with the Equal Employment

Opportunities Commission ("EEOC"). On or about October 28, 2003, she received a release of jurisdiction from the CCHRO and on or about November 3, 2003, plaintiff received a Notice of Right to Sue from the EEOC.

## II. DISCUSSION

Williams alleges that defendants Quebecor Infiniti Graphics Inc. ("Infiniti") and Quebecor World (USA) Inc. ("Quebecor World") terminated her employment at Infiniti on the basis of her age, in violation of the Age Discrimination in Employment Act ("ADEA") and the Connecticut Fair Employment Practices Act ("CFEPA"). Because defendants have not shown that they are entitled to summary judgment, their motion is denied.

### A.   STANDARD OF REVIEW

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The burden is

on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)). A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id.

### B. DISCRIMINATION CLAIMS

Plaintiff alleges that her employer discriminated against her on the basis of her age in violation of the ADEA and CFEPA. The ADEA seeks to "promote employment of older persons based on their ability rather than age . . . [and] to prohibit arbitrary age discrimination in employment . . . ." 29 U.S.C. § 621(b). In addition, the ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect

to his compensation, terms, conditions, or privileges or employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  The CFEPA also makes it is unlawful for employers to refuse to hire or discharge from employment any person on the basis of age.  Conn. Gen. Stat. § 46a-60(a). The Connecticut Supreme Court looks to federal precedent when interpreting and enforcing the CFEPA.  See Levy v. Commission of Human Rights and Opportunities, 236 Conn. 96, 103 (Conn. 1996); see also McInnis v. Town of Weston, 375 F. Supp. 2d 70, 85 (D. Conn. 2005)(stating that CFEPA claims proceed under the same analysis as ADEA claims). Accordingly, the Court will analyze plaintiff's CFEPA and ADEA claims together.

In McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802 (1973), the Supreme Court established an "allocation of the burden of production and an order for the presentation of proof in Title VII cases."  Under that framework,[14] a plaintiff alleging a violation of the discrimination statutes must establish a prima facie case by showing she:  (1) was a member of a protected class; (2) was qualified for the position she held; (3) suffered an adverse employment action; (4) in circumstances giving rise to an

---

[14]  Title VII principles are applicable to ADEA cases since the substantive prohibitions of the ADEA were derived in haec verba from Title VII.  Lowe v. Commack Union Free School Dist., 886 F.2d 1364, 1369 (2d Cir. 1989).

inference of discrimination.  See Schnabel v. Abrahmson, 232 F.3d 83, 87 (2d Cir. 2000); see also Texas Dept. Of Community Affairs v. Burdine, 450 U.S. 248, 253 (1985) ("The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.").  If the plaintiff establishes a prima facie case, the employer has the burden of articulating a "legitimate, nondiscriminatory reason" for the adverse employment action.  Stern v. Trustees of Columbia University, 131 F.3d 305, 312 (2d Cir. 1997).  If the employer does so, the plaintiff must prove by a preponderance of the evidence that the employer's proffered explanation is unworthy of credence, and that the true reason for the employer's action was discrimination. See id.

Williams has made a prima facie showing of age discrimination.  When she was terminated at age fifty-eight, she was a member of the protected class who was qualified for her position.  In addition, she has established that the adverse employment action, her termination, occurred under circumstances giving rise to an inference of discriminatory intent.  For instance, Amarante's remarks, "What's up with the gray hair?" and "Hey, when are you retiring? I want your job," combined with Toombs's two separate inquiries into

plaintiff's retirement plans and his comment to plaintiff regarding the Westvaco layoffs all support the inference of age discrimination.  Plaintiff alleges that the age-biased remarks made by Amarante and Toombs were made during the same time period these managers were considering whether a position in the sales department had to be eliminated.  In addition to the temporal proximity of these remarks and Williams's termination, Williams has provided deposition testimony that defendants advertised for a sales position at the time of her termination.  She also offered evidence showing that when she and Burdick, another employee who was a member of the protected class, left the company, younger employees assumed their responsibilities.  A reasonable juror considering the totality of this evidence could find that age discrimination occurred.  Williams has therefore met her de minimis burden of establishing a prima facie case.

Defendants have met their burden to proffer a legitimate, non-discriminatory reason for terminating Williams.  They assert that plaintiff's termination was the result of a business decision to reduce costs and overhead. Indeed, defendants argue that eliminating Williams's position was necessary to efficiently effectuate a reduction in costs and overhead without having a substantial, negative impact on revenue.  This offer of proof is sufficient to

meet defendants' burden at this stage in the analysis because defendants bear merely a burden of production, not a burden of persuasion.  <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 142 (2000).

Plaintiff may be able to meet her burden of showing that defendants' reason for her termination was pretextual and that defendants discriminated against her because of her age.  For example, plaintiff has established that there are factual disputes surrounding the veracity of defendants' proffered reason for her termination because the record contains conflicting evidence concerning whether she was a sales representative or an envelope specialist, whether she increased her sales accounts, whether her sales volume was higher than others in the sales department, whether she was expected to prospect for new clients, whether Toombs thought she had enough time to prospect for clients before she would retire, and whether Toombs prevented her from bringing in new clients by not acting on her list of perspective new clients.  If these disputes are resolved in plaintiff's favor, a jury may find that defendant's proffered reason for plaintiff's termination was false and a pretext for discrimination.

Further, Toombs's testimony that he did not set sales goals for plaintiff because he "knew she couldn't do it" is

insufficient to justify her termination.  An employer's
subjective evaluations "are not adequate [justification] by
themselves because they may mask prohibited prejudice."
Sweeney v. Research Foundation of St. Univ. of New York, 711
F. 2d 1179, 1185 (2d Cir. 1983); see also Knight v. Nassau
County Civil Service Comm'n, 649 F. 2d 157, 161 (2d Cir.
1981)(holding that an employer may not use completely
subjective and unarticulated standards to judge employee
performance.)  "[T]he evidence produced by the employer
should be [both] objective and competent." Sweeney, 711 F.
2d at 1185. Plaintiff has produced sufficient evidence to
create a triable issue of fact as to whether she could meet
sales goals because she has offered evidence that she
increased her accounts and tried to bring in business.
Further, Toombs admits that he does not know what happened
to the list of prospects plaintiff gave him.

      The comments that plaintiff attributes to both Toombs
and Amarante further create an issue of fact over whether
defendants' reason for plaintiff's termination was merely a
pretext.  Williams argues that the five comments made by
Toombs and Amarante establish discriminatory animus.
Defendants admit to making some of the alleged comments, but
assert that they were only inquiring into plaintiff's

retirement intentions for planning purposes and that plaintiff misconstrued these statements.

Regardless of what defendants intended by the comments, "evidence of remarks by employer reflecting discriminatory motive [i]s sufficient to 'raise[] a triable issue as to whether the articulated reasons for [the employer's conduct] were pretextual.'" Holtz v. Rockefeller and Co., Inc., 258 F.3d 62, 78 (2d Cir. 2001) (quoting Owens v. New York Hous. Auth., 934 F.2d 405, 410 (2d Cir. 1991)).  Here, the number of the alleged comments must be taken into consideration along with plaintiff's claims that (1) she was Infiniti's second-oldest employee; (2) she held the position of sales representative and not "envelope specialist;" (3)  she was a successful sales person; (4) she successfully increased her existing accounts; and (5) at the same time her managers were allegedly making these comments they were deciding whether to eliminate her position.  Taken together, these factors could be considered additional indicia of discrimination.

In addition, the comments made by Amarante and Toombs are not stray comments.  Stray comments alone are not sufficient to support an inference of age discrimination; however, they must be viewed in light of all surrounding circumstances. See e.g. Woroski v. Nashua Corp., 31 F.3d

105, 109-110 (2d Cir. 1994)(some evidence of age bias in testimony about an employer's statement is not sufficient to withstand a properly supported motion for summary judgment); see also Schug v. The Pyne-Davidson Co., No. 3:99-CV-1493 CFD, 2001 WL 34312877, at *5 (D. Conn. Dec. 10, 2001) ("[c]ertainly, comments concerning retirement can be made without suggesting age discrimination.  However, like any remarks, they must be viewed in context, along with the specific language used and the number of times the comments were made.") The Second Circuit has held that when an employer had a legitimate reason to question whether an employee was taking early retirement, the comments did not reflect a discriminatory animus, Raskin v. Wyatt Co., 125 F.3d 55, 63 (2d Cir. 1997), however, the proper focus is on whether there is a nexus between the comments and the decision to terminate the employee.  See, e.g., Danzer v. Norden Systems, Inc., 151 F.3d 50, 56 (2d Cir. 1998)(holding that stray comments without more cannot establish a case of employment discrimination, but if "other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray' and the jury has a right to conclude that they bear a more ominous significance"); Feldman v. Looms, No. 98-9680, 1999 U.S. App. LEXIS 25092, at *5 (2d Cir. Oct. 4, 1999) (affirming grant of summary

judgment for employer where there was no nexus between the stray remarks and the later decision to terminate the employee). In the instant case, there is a factual dispute concerning the nexus between the comments and the desire to terminate plaintiff because the managers who allegedly made the comments did so at the same time they were discussing eliminating her position.  Further, defendants admit that they did not ask other sales representatives about their retirement plans.  Thus, a fact finder could find that these remarks were not stray comments, but rather an indication that the decision to terminate plaintiff was at least in part motivated by discrimination.  "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination[,]" Reeves, 530 U.S. at 153, and in the instant case, based on the issues of fact relating to whether the five comments could be interpreted as being age-related and the ambiguity over plaintiff's actual job responsibilities and sales performance, it is possible that a jury could infer that Infiniti's proffered reason for eliminating Williams' position was simply a pretext for discrimination, and that it is more likely than not that plaintiff's age was the real reason for her

termination.  Accordingly, defendants' motion for summary judgment is denied.

### C. PLAINTIFF'S EMPLOYMENT STATUS WITH QUEBECOR WORLD

In a footnote within their brief in support of defendants' motion for summary judgment, defendants argue, without relying on any authority, that Quebecor World (USA) Inc. ("Quebecor World"), is entitled to summary judgment because "plaintiff has never been an employee of Quebecor World and it [Quebecor World] is not an 'employer' as that term is used in either of the statutes under which plaintiff seeks relief." (Dkt.# 43.)  Plaintiff counters that "Quebecor World Infiniti Graphics ("Infiniti") was a wholly owned subsidiary of Quebecor World (USA) which hold themselves out as an integrated business, with a common address, common ownership and common purpose." (Dkt. # 50.)

The Second Circuit applies a four-part test to determine whether a parent company may be considered an employer of a subsidiary's employees.  Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1240-41 (2d Cir. 1995).  A parent and subsidiary cannot be found to represent a single, integrated enterprise in the absence of: (1) interrelated operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control.  Id.  Although Cook is a Title VII case, courts use

the same analysis in ADEA cases.  See Lowe, 886 F.2d at 1369
(Title VII principles are applicable to ADEA cases since the
substantive prohibitions of the ADEA were derived in haec
verba from Title VII).  The inquiry should focus on the
second factor, the centralized control of labor relations.
Cook, 69 F.3d at 1241.  The four-part test may be satisfied
"by a showing that there is an amount of participation
[that] is sufficient and necessary to the total employment
process, even absent total control or ultimate authority
over hiring decisions." Id. (quoting Armbruster v. Quinn,
711 F.2d 1332, 1338 (6th Cir. 1983)).

There are genuine issues of material fact surrounding
the second and third factors.  For instance, William
Sherman, Quebecor World's Vice President of Sales for New
England, avers that in 2001, the sales managers at several
of Quebecor World's subsidiaries, including, Infiniti
reported to him.  In addition, Toombs, plaintiff's direct
supervisor, directly reported to Sherman.  The affidavits of
Toombs and Sherman further show that there may have been
centralized control of labor relations and common
management.  Toombs and Sherman both aver that Sherman
advised Toombs that a position in the Infiniti's sales
department may need to be eliminated.  Subsequent to this
conversation, Toombs asserts, "I communicated my decision

[to eliminate the envelope specialist position occupied by
Carlene Williams] to Bill Sherman and was told that he would
get back to me . . . ."  (Dkt. # 48, Toombs Aff., Ex. E ¶
17.)  Sherman states, "I agreed with that decision, as I was
aware of the fact that the business that Carlene Williams
serviced consisted primarily of two customers of Infiniti
Graphics . . . . "  (Dkt. # 48, Sherman Aff., Ex. F ¶ 9.)
Toombs also states, "Sometime in the weeks prior to November
9, 2001, I was advised by Bill Sherman that we would in fact
have to eliminate another position from the sales force and,
accordingly, the 'envelope specialist position' was
eliminated . . . . "  (Dkt. # 48, Toombs Aff., Ex. E ¶ 17-
18.)  Taken in the light most favorable to the non-moving
party, it appears that both Sherman and Toombs were involved
in the decision-making process to eliminate plaintiff's
position.  Further, it is not clear which manager decided to
eliminate Williams's position.  In addition, plaintiff has
offered testimony indicating that Toombs and Sherman both
told her that they did not have time to meet with her even
though they met with the other, younger sales
representatives during the fall of 2001.  As such,
defendants' have not established that there are no genuine
issues of material fact regarding centralized control of
labor relations and common management.  Defendants' request

that summary judgment be entered in favor of Quebecor World is denied.

### III. CONCLUSION

For the foregoing reasons defendants' motion for summary judgment (**dkt. # 41**) is **DENIED**. The parties shall file a joint trial memorandum on or before December 15, 2006.

So ordered this <u>16th</u> day of October, 2006.

_____/s/DJS_____
**DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**
